**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT DEFICCIO, et al.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>WINNEBAGO INDUSTRIES, INC.,<br><br>　　Defendant. | CIVIL ACTION NO. 11-7406 (MLC)<br><br>**MEMORANDUM OPINION** |

**COOPER, District Judge**

　　The plaintiffs, Robert Deficcio and Mary Jo Deficcio (collectively the "plaintiffs"), brought this action against the defendant, Winnebago Industries, Inc. ("Winnebago"), asserting a claim for breach of the Settlement Agreement. (See dkt. entry no. 7, Am. Compl.)[1] Winnebago earlier moved for summary judgment in its favor and against the plaintiffs, as to the sole remaining claim for breach of the Settlement Agreement. (See dkt. entry no. 29, Notice of Winnebago Mot. for Summ. J.) The Court denied Winnebago's motion for summary judgment without prejudice, finding that "the issue regarding the reliability of the opinions of plaintiff's expert witness should be resolved before the Court considers Winnebago's [motion for summary judgment]." (See dkt. entry no. 35, 1-14-14

---

[1] The plaintiffs also asserted – in the Amended Complaint – claims for violation of the Magnuson-Moss Act, breach of express and implied warranties, violation of the New Jersey Consumer Fraud Act, negligence, and punitive damages, but the Court dismissed all of these claims. (See dkt. entry no. 15, 5-21-12 Order.)

Mem. Op. at 2.) The Court also directed that Winnebago move to strike the opinions of the plaintiffs' expert witness. (See id. at 3.)

Winnebago now moves to strike the opinions of the plaintiffs' expert, Charles Barone, as unreliable and moves to preclude the plaintiffs from offering any expert evidence or testimony in this matter (the "Motion"). (See dkt. entry no. 37, Notice of Winnebago Mot.; dkt. entry no. 37-1, Winnebago Br.) The plaintiffs oppose the Motion. (See dkt. entry no. 39, Opp'n Br.)

The Court will resolve the Motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b). The Court, for the reasons stated herein, will grant the Motion in part and deny the Motion in part. The Court will grant the portion of the Motion seeking to strike the opinions of the plaintiffs' expert, Charles Barone. The Court will deny the portion of the Motion seeking to preclude the plaintiffs from offering any expert evidence or testimony in this matter.

## I. BACKGROUND

The plaintiffs purchased a Winnebago motor home, which allegedly suffered numerous breakdowns and component failures. (See Am. Compl. at ¶¶ 5, 8.) The parties negotiated certain repairs to be made to the vehicle, and entered into a Settlement Agreement on May 27, 2010. (See id. at ¶ 11; see also Am. Compl., Ex. E., 5-27-10 Settlement Agreement.) The Settlement Agreement provided that Winnebago would transport the vehicle to and from its Forest City, Iowa manufacturing facility for numerous repairs to be performed on specified components. (See Am. Compl. at ¶ 12.) Such repairs, listed in exhibits to the Settlement Agreement, were to be "performed to commercially reasonable

standards and warranted by Winnebago for six (6) months from the return of the vehicle" to the plaintiffs. (See 5-27-10 Settlement Agreement at ¶ 1.) Winnebago also agreed to pay the plaintiffs $17,500. (See id.) In exchange, the plaintiffs agreed to release and forever discharge Winnebago "from any and all claims and causes of action . . . based on any alleged defects or non-conformities which were asserted or could have been asserted involving the Subject Vehicle up to the date of this Settlement Agreement and Release." (Id. at ¶ 2.)

The plaintiffs state that the vehicle remained at Winnebago's Iowa facility for repairs for approximately seven weeks instead of the originally contemplated three to four weeks. (See Am. Compl. at ¶¶ 17-18.) The plaintiffs further allege that when the vehicle was returned to them, they noticed "numerous unrepaired defects and conditions that were to be repaired or replaced pursuant to" the Settlement Agreement, and in addition the vehicle had sustained new and additional damage while in Winnebago's custody. (See id. at ¶¶ 22-23.) In particular, the plaintiffs allege that "the returned motor home exhibited evidence of undisclosed collision damage and subsequent undisclosed repairs to the vehicle's passenger side including a 4' x 5' area of the passenger side that appeared to have been damaged and repaired along with a crease in the metal of the rear most cargo door and related scratches (hereinafter the 'undisclosed body damage')." (See Opp'n Br. at 1.) The Amended Complaint additionally lists fifty-six examples of unrepaired damage to or defects of the vehicle. (See Am. Compl. at ¶ 24.)

The plaintiffs retained Charles Barone to inspect the alleged undisclosed body damage items and to opine on the motor home's diminished value resulting from the undisclosed body damage and the resulting repair attempts. (See Opp'n Br. at 1; see also Am. Compl., Ex. F,

3

Barone Report.) Among other things, Barone opines that the motor home's value has been impaired in the amount of $39,150 due to the undisclosed body damage and the resulting repair attempts. (See Opp'n Br. at 2; see also Am. Compl., Ex. F, Barone Report.)

## II.     DISCUSSION

### A.     Legal Standard

Federal Rule of Evidence ("Rule") 702 governs the admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. The Court's gatekeeping function under Rule 702 is "a flexible one," and the focus "must be solely on principles and methodology, not on the conclusions that they generate." See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 580 (1993).

The United States Court of Appeals for the Third Circuit has "recognized Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." See Furlan v. Schindler Elevator Corp., 516 Fed.Appx. 201, 205 (3d Cir. 2013) (internal quotation marks omitted). "Qualification refers to the requirement that the witness possess specialized expertise." Id. "To establish reliability, the testimony must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his on [sic] her belief." Id. (internal quotation marks

4

omitted).  "As for fit, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Id.

A court should consider several factors in evaluating whether a particular methodology is reliable.[2]  These factors may include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994) (listing factors deemed important by courts in Daubert and United States v. Downing, 753 F.2d 1224 (3d Cir. 1985)).

The Third Circuit has stated that

> [t]he factors drawn from Daubert and Downing, however, "are neither exhaustive nor applicable in every case." Kannankeril [v.Terminix Int'l, Inc.], 128 F.3d [802,] 806-07 [(3d Cir. 1997)]; see also Kumho Tire [Co. v. Carmichael], 526 U.S. [137,] 151 [(1999)] . . . (noting that Daubert itself "made clear that its list of factors was meant to be helpful, not definitive") . . . . "The inquiry envisioned by Rule 702 is . . . a flexible one." Daubert, 509 U.S. at 594[.]

Pineda v. Ford Motor Co., 520 F.3d 237, 248 (3d Cir. 2008).

---

[2] The Motion here is premised on Winnebago's position that "Mr. Barone's opinions should be stricken as unreliable . . . because they are based upon incorrect assumptions of fact and are based upon an untested and unreliable methodology." (See Winnebago Br. at 6.)  The Court therefore will concentrate its analysis on whether Barone's opinions are reliable.

5

### B. Analysis

Winnebago argues that "Mr. Barone's opinions should be stricken as unreliable . . . because they are based upon incorrect assumptions of fact and are based upon an untested and unreliable methodology that fails to satisfy any of the eight factors used to determine reliability in the Third Circuit." (See Winnebago Br. at 6.) Winnebago stresses that "Mr. Barone's opinions are all based upon the assumption that at the time the vehicle was delivered to Winnebago for performance of the Settlement Agreement repairs in June 2010, the vehicle was in 'pristine condition.'" (Id.) Winnebago then states that "Mr. Barone's assumption was plainly wrong," as plaintiff Robert Deficcio "testified that there was already existing body damage when it left for the Winnebago factory in June 2010 and also, that repairs to correct certain alleged body damage was 'one of the reasons it was going [to the Winnebago factory in Iowa].'" (Id.) Winnebago further notes that plaintiff Robert Deficcio "testified that the subject vehicle had already been subject to repair at least twice before it went to the Winnebago factory for repairs in June 2010," yet "[n]one of the prior body damage or repairs is referenced in Mr. Barone's report." (Id. at 7.) Winnebago therefore argues that "Mr. Barone's opinions must be stricken because they are undisputedly based upon inaccurate assumptions of fact which, by Mr. Barone's own testimony, served as the foundation for such opinions." (Id. at 8.)

Winnebago also contends that "as a practical matter, Mr. Barone's conclusions that Winnebago failed to repair the vehicle to 'commercially reasonable standards' and that such failure resulted in a certain diminution to the vehicle's value is unreliable because, quite

simply, Mr. Barone reached this conclusion prior to Winnebago's completion of repairs."

(Id.)

>Winnebago's final argument is that
>
>Mr. Barone's report must be stricken and his opinions excluded as unreliable because the methodology used by Barone to reach his opinions regarding "diminished value" damages is unreliable. Indeed, Mr. Barone testified at his deposition that the methodology he used to reach the diminished value figure in his report was his own, that it was proprietary and that "[i]t is not something that I share with anyone" (Barone TR at p. 78, relevant portions attached as Exhibit "F" to the Skanes Decl.). Moreover, Mr. Barone conceded that his methodology has never been submitted for peer review (id. at p. 80). In addition, Mr. Barone conceded that there are no industry standards for determining diminished value (id. at p. 80). Furthermore, Mr. Barone conceded that in New Jersey, there is no generally accepted methodology for determining "diminished value" damages (id. at p. 49). Likewise, Mr. Barone has never tested his own methodology and does not know any rate of error in its application (id. at p. 81). Thus, the methodology used by Mr. Barone in reaching his opinions fails to satisfy any of the factors to be considered by courts in the Third Circuit when determining reliability of an expert's opinions. See Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000).

(Id. at 9.)

The plaintiffs conversely argue that Barone's report, which considers the diminished value damages flowing from the undisclosed body damage and repairs, is reliable and based on a coherent methodology. (See Opp'n Br. at 6.) They assert that the test of reliability is flexible, and that depending on the particular circumstances of a case, the reliability factors – listed above – may or may not be pertinent in assessing reliability. (See id.)

The plaintiffs proceed to describe Barone's methodology:

>Barone followed all four elements of his methodology in determining the diminished value of plaintiffs' motor home arising from the undisclosed body damage and resulting improper repairs. Barone determined a base value for

7

plaintiffs' motor home in an undamaged condition, he examined the vehicle to determine the severity of the damage, and he analyzed the type of damage (i.e. mere paint imperfections versus body damage appearing to result from collision damage) and then considered the nature of the vehicle, a luxury motor home.

After determining that the motor home had suffered undisclosed damage to the side of the vehicle and that undisclosed body repairs were made to the vehicle, Barone made use of the established and well recognized National Automobile Dealers Association "NADA" recreational vehicle valuation guide. Barone opined that the undisclosed damage and commercially unreasonable repairs placed the motor home's value in the "low retail value" range of $191,150 compared to the "Average Retail Value" range of $230,000. The $39,150 difference between these two ranges represented the loss of value resulting from the undisclosed damage and commercially unreasonable repairs.

(Id. at 7.)

The plaintiffs further argue that "Any Pre-Inspection or Post Inspection Body Repairs Were Either di [sic] minimis or Irrelevant." (Id. at 8.) The plaintiffs maintain that "[p]rior to the Settlement Agreement repairs, the only body repairs to the motor home involved an incident where a dropped wrench took a chip out of the vehicle's fiberglass and some post-purchase paint chip repairs." (Id.) The plaintiffs thus state that "Barone's testimony makes clear that his assumptions as to previous body damage applied to prior 'accident' or 'collision damage' sustained by the motor home rather than mere touching up of minor paint defects." (Id.)

The Court agrees with Winnebago that the plaintiffs have failed to meet their burden of demonstrating that Barone's opinions are reliable. (See dkt. entry no. 40, Winnebago Reply Br. at 4.) See In re TMI Litig., 193 F.3d 613, 705 (3d Cir. 1999) ("[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance

8

of the evidence."); United States v. Schiff, 538 F.Supp.2d 818, 834 (D.N.J. 2008) ("The burden for demonstrating admissibility lies with the proponent of the expert testimony, by a preponderance of the evidence."). To the contrary, Winnebago has demonstrated that Barone's methodology is not reliable.

Barone's methodology for determining the diminution in value involved an assessment of the following four factors: (1) the vehicle book value; (2) the amount or severity of damage to the vehicle based on the cost of repairs; (3) the type of damage; and (4) the nature of the vehicle. (See Opp'n Br., Ex. B, Barone Dep. 60:7-61:20.) Barone stated in his report that, through interviews with relevant individuals including the plaintiffs, he learned that the motor home was "in pristine condition prior to the manufacturer's possession." (See Barone Report at 7) He also discussed the results of his sole inspection of the motor home, which took place after the vehicle was returned to the plaintiffs from the manufacturer. (See id.) Barone identified several instances of body damages during this inspection, including an "indication of a body repair . . . with what is referred to as a 'bulls-eye,'" an indication that "refinish materials were applied," "a crease in rear most cargo door," a malfunctioning awning mechanism, two tape edges, and "two longitudinal scratches." (See id. at 2-6.)

Proceeding with his methodology, he utilized the publicly accessible NADA Value Guide and simply placed the motor home within one of only two broad value categories – Barone categorized the motor home's value as "low retail value" as opposed to "average retail value." (See id. at 7.) The two NADA value categories are defined as follows:

> Low Retail: Low Retail Value – a low retail unit may have extensive wear and
> tear.  Body parts may have dents and blemishes.  The buyer can expect to
> invest in cosmetic and/or mechanical work.  This vehicle should be in safe

9

>running order.  Low retail vehicles usually are not found on dealer lots.  Low retail is not a trade-in value.
>
>Average Retail: an average retail vehicle should be clean and without glaring defects.  Tires and glass should be in good condition.  The paint should match and have good finish.  The interior should have wear in relation to the age of the vehicle.  Carpet and seat upholstery should be clean, and all power options should work.  The mileage should be within the acceptable range for the model year.

(See id.)  Barone opined that the "low retail value and its provision in the NADA guide fit the circumstances and condition of the subject vehicle and therefore determine its value." (Id.)  He further reasoned that "[o]n the basis of the foregoing facts and conditions, and applying the differential between 'average retail value' and 'low retail value,' the value of the subject vehicle is diminished by approximately $39,150.00, with a projected value of $191,150.00." (Id.)

The Court does not find Barone's methodology to be reliable.  Although this Court acknowledges that the reliability factors enumerated in Daubert and Downing "are neither exhaustive nor applicable in every case," the Court finds that they are helpful here.[3]  The Court has considered the reliability factors and finds that Barone himself conceded that: his methodology has not been subjected to peer review; there are no industry standards for determining diminished value; he has not tested the accuracy of his methodology and does not know his methodology's rate of error; and he does not share his method with anyone (thus, it is not generally accepted).  (See Barone Dep. 78:2-11, 79:23-80:1, 80:14-81:24.)  Barone

---

[3] The plaintiffs intriguingly omit any argument that Barone's opinions are reliable through an analysis of the eight reliability factors.

moreover did not adequately assess factor two of his methodology: the amount or severity of damage to the vehicle based on the cost of repairs. (See Barone Dep. 60:7-61:20.) Proper assessment of this factor would require Barone to identify how much it cost, or would cost, to repair the damage. Instead, Barone only determined the nature of the damage, and then how the existence of that damage affected the vehicle's classification in terms of the NADA Value Guide. He did not determine the severity of the damage. Because Barone did not even follow his own methodology, the Court is unsure how his "method consists of a testable hypothesis." See Smith v. Freightliner, LLC, 239 F.R.D. 390, 393 (D.N.J. 2006) (finding Barone's method for determining diminution in value unreliable, as he did not follow his own methodology.)

In Smith, Barone employed a similar method for determining the diminution in value. He likewise considered four factors, with three of the four being the same. The four factors he considered in Smith were: (1) the nature of the vehicle; (2) the nature of the vehicle damage; (3) the severity of the damage (cost to repair and number of attempts to repair); and (4) the impact of the "stigma" attached to the vehicle due to the damage. See id. The court determined that Barone did not adequately assess factors two and three of his own methodology. See id. The court further stated that a basic requirement under Daubert is that the methodology be capable of being replicated (i.e., consists of a testable hypothesis), and because Barone did not follow his own methodology, it cannot be replicated. See id. Although Barone's methodology now employs the NADA Value Guide to aid his calculations, Smith nonetheless demonstrates the impact Barone's failure to follow his own methodology has on the analysis of the reliability factors.

Considering the above, the Court is convinced that Barone's methodology is not reliable. Accordingly, Barone will not be permitted to testify as to the diminution in value of the motor home.[4] The Court declines at this time to preclude plaintiffs from offering any expert evidence or testimony in this matter.

## III.   CONCLUSION

For the reasons stated, and for good cause showing, the Court will grant the Motion in part and deny the Motion in part. The Court will issue an appropriate order.

    s/ Mary L. Cooper  
**MARY L. COOPER**  
United States District Judge

Dated: August 25, 2014

---

[4] Though bearing no weight on the Court's ruling, we must also comment on the fact that the NADA Value Guide may not be the most equitable approach of determining the alleged loss. The NADA value sheet for the 2008 Winnebago M-40FD motor home lists the base price for such a motor home for both the low retail and average retail categories. (See Opp'n Br., Ex. A, Barone Report & NADA value sheet for 2008 Winnebago M-40FD motor home.) The NADA value sheet lists the low retail base price as $184,590 and the average retail base price as $222,400. (See id.) Beyond the base price values, several additional optional features (e.g. dishwasher, microwave) and their corresponding values are listed, with different values for the same optional features depending on whether the motor home is categorized as low retail or average retail. For instance, a dishwasher and a microwave add $490 and $330 respectively to the base price of a low retail value motor home, while the same optional features add $590 and $395 respectively to the base price of an average retail value motor home. See id. In categorizing the plaintiffs' motor home as a low retail value motor home, Barone took the low retail base price ($184,590) and added the optional feature values in order to reach the total value discuss above ($191,150). As the damages alleged by the plaintiffs are limited to exterior body damage, the Court sees no reason why Winnebago should be asked to pay for the diminution of value of optional features that are unrelated to the plaintiffs' claims. This is what Barone's methodology anticipates, as the NADA value sheet values optional features differently based on whether the vehicle as a whole is considered low retail or average retail. Certainly the exterior body damage does not devalue the dishwasher.

12